UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SAFESPAN PLATFORM SYSTEMS, INC.,
LAMBROS APOSTOLOPOULOS and
PAUL KRISTEN, INC.,

                            Plaintiffs,

        v.                                          DECISION AND ORDER
                                                    06-CV-726A

EZ ACCESS,  INC., and
ANASTASIOS G. HATSIOS,
                            Defendants.

## INTRODUCTION

This is a patent infringement action brought by plaintiffs Safespan Platform

Systems, Inc., Lambros Apostolopoulos, and Paul Kristen, Inc. (collectively

"Safespan") against EZ Access, Inc. and Anastasios Hatsios (collectively "EZ

Access").  On May 13, 2009, this Court held a <u>Markman</u>[1] hearing and issues this

Decision and Order resolving the disputed claims.

## BACKGROUND

This case involves two patents owned by Safespan: U.S. Patent Nos.

6,302,237 ("the '237 patent") and 6,135,240 ("the '240 patent").  The patents-in-

suit relate to bridge platforms which are erected beneath the deck of an existing

bridge to support workers performing maintenance or other work on the bridge

---

[1] <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967 (Fed. Cir.1995), *aff'd*, 517 U.S.
370 (1996).

structure. The bridge platform system involves individual flooring panels that are laid upon horizontal cables that extend beneath the bridge.

Defendant Anastasios Hatsios was employed by Safespan between 1995 and 2003, during which time Mr. Apostolopoulos applied for and was granted the patents-in-suit. Safespan alleges that when Mr. Hatsios departed in January 2003, he told Safespan that he was retiring. Rather than retire, Mr. Hatsios created a new company called EZ Access, Inc., a bridge platform company that Safespan alleges competes directly with Safespan, and uses a process that violates Safespan's patents.

## A. Safespan's Patents

The dilemma sought to be addressed by the invention was the need to provide a safe and effective support system for workers performing cleaning and maintenance of the surfaces beneath the deck or roadway of a bridge. Much of the prior art for such bridge structures involved complex systems that were time consuming to erect and dismantle. Other prior art structures were limited in height by the manner in which they were attached to the bridge, or were not sufficiently rigid to perform the task.

The invention sought to provide a new and improved bridge platform and method of erecting it that: was sufficiently rigid to support workers standing and walking upon it; was quick, easy and economical to erect and dismantle; and

extended for a significant portion of the length of the bridge so that the required maintenance could be performed. Both patents summarize the invention as follows:

> The present invention provides a bridge platform and method of erecting the same wherein a plurality of cables extend along a section of the bridge in spaced relation below the deck or roadway and steel support structure of the bridge, which cables are supported at opposite ends by a structure of the bridge such as the space-apart vertical peers of the bridge, and wherein a plurality of platform flooring panels or sections are supported on the cables, extend laterally of the cables, are arranged side-by-side along the section of the bridge such as between the peers and are removably secured to the cables. The cables preferably are attached to the bridge piers by compression clamp structures. The platform flooring sections comprise elongated rectangular corrugated decking tiles and are arranged in end-to-end overlapping relation transversely of the cables, side-to-side overlapping relation along the bridge and with the corrugations extending transversely of the cables. The corrugations maximize the strength-to-weight ratio of the platform flooring and provide recesses or receptacles to contain debris and facilitate its collection and removal. Each of the platform flooring sections is releasably connected at spaced locations to the supporting cables on which it rests. This is provided by connector assemblies each comprising a first part which engages the upper surface of the flooring section and the cable and a second part which engages the upper surface of the flooring section, the two parts being removably connected together through a small opening in the flooring. As a result, individual flooring sections can be removed to provide access through the flooring in emergency or critical situations while at the same time allowing the remainder of the flooring to retain collected debris.

See '237 Patent, Col. 1, line 43 to Col. 2 line 6; and '240 Patent, Col. 1, line 40 to Col. 2, line 2. The following constitutes this Court's construction of the disputed claims.

## DISCUSSION

### I.    Claims at Issue

The claims involved here are set forth below, with the disputed terms

emphasized:

### Claim 1 of the '237 patent

1.    In combination with a bridge having a deck, a platform disposed below said bridge deck and attached to said bridge and extending along a portion of the bridge for supporting persons performing work on the bridge portion and for collecting debris resulting from the work, the platform comprising:

a) a plurality of cables extending along said bridge and in spaced relation to each other and in a plane substantially parallel to the plane of said bridge deck;

b)   **means at each end of said cables for securing said cables to said bridge** so that the plane of the cables is at a desired distance below the bridge portion;

c)   a floor comprising a plurality of flooring panels each extending transversely of said cables and resting on said cables, each of said panels having at least one **means defining an opening therein**; and

d)   **means for releasably securing said flooring panels to said cables** so that said flooring panels are individually removable from said floor and so that the platform may be repeatedly assembled and disassembled, said releasably securing means including a member extending through each of said opening means and having a portion which is shaped to define with said respective panel an eyelet, said opening means being sized for passage therethrough of said eyelet portion, and said cables passing through respective ones of said eyelets.

**Claim 1 of the '240 patent:**

1.    In combination with a bridge having a deck, a platform disposed below said bridge deck and attached to said bridge and extending along a portion of the bridge for supporting persons performing work on the bridge portion and for collecting debris resulting from the work, the platform comprising:

> a) a plurality of cables extending along said bridge and in spaced relation to each other and in a plane substantially parallel to the plane of said bridge deck;
>
> b) **means at each end of said cables for securing said cables to said bridge** so that the plane of the cables is at a desired distance below the bridge portion;
>
> c) a floor comprising a plurality of flooring panels each extending transversely of said cables and resting on said cables, each of said panels having at least one **means defining an opening therein**; and
>
> d) **means for releasably securing said flooring panels to said cables**, said releasably securing means including means defining eyelets on said flooring panels, each said opening at least partially receiving one of said eyelets, and said cables passing through respective ones of said eyelets on said flooring panels.

Before the hearing, the parties submitted a chart stipulating as to a number of claim terms that are not in dispute.  The Court will accept and apply those stipulated definitions.  Therefore, only the disputed terms will be construed in accordance with the principles set forth below.


**II.**    **Legal Principles**

The analysis of a claim of literal patent infringement involves two steps: the

proper construction of the asserted claim and a determination of whether the accused method or product infringes the asserted claim as properly construed. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). The first step, claim construction, is a matter of law that must be addressed by the court, rather than the jury. Markman v. Westview Instruments, Inc., 517 U.S. at 370, 390 (1996).

In construing an asserted claim, the court must look first to the intrinsic evidence of the record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history. See Markman, 52 F.3d at 979. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

First, the Court must look at the words of the claims themselves to find the scope of the patented invention. Id. (citations omitted); Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 619-20 (Fed. Cir. 1995) ("First, and most importantly, the language of the claim defines the scope of the protected invention."). The words used in a claim are generally given their ordinary and customary meaning. Vitronics, 90 F.3d at 1582; York Prods. v. Central Tractor  Farm & Family Ctr., 99 F.3d 1568, 1572 (Fed. Cir. 1996). A patentee may, however, choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the

6

term is clearly stated in the patent specification or file history.  Vitronics, 90 F.3d

at 1582 (citations omitted).

The court must construe the language in the patent claims in the same

manner the claims would be construed by one "skilled in the art."  Hoechst

Celanese Corp. v. BP Chems., Ltd., 78 F.3d 1575, 1578 (Fed. Cir.), cert. denied,

117 S. Ct. 275 (1996) ("A technical term used in a patent document is interpreted

as having the meaning that it would be given by persons experienced in the field

of the invention, unless it is apparent from the patent and prosecution history that

the inventor used the term with a different meaning.").  A person "skilled in the

art" possesses an appropriate level of knowledge and experience in the technical

field in question.

After examining the claims themselves, the court must next review the

specification to determine whether the inventor has used any terms in a manner

inconsistent with their ordinary meaning.  Vitronics, 90 F.3d at 1582.  The

specification contains a written description of the invention that enables a person

of ordinary skill in the art to make and use the invention.  Id.; Markman, 52 F.3d

at 979.  "The specification acts as a dictionary when it expressly defines terms

used in the claims or when it defines terms by implication."  Vitronics, 90 F.3d at

1582.  "Claims must be read in view of the specification, of which they are a part."

Markman, 52 F.3d at 979.  "[T]he specification is always highly relevant to the

claim construction analysis" and is usually dispositive.  Vitronics, 90 F.3d at 1582.

"[I]t is the single best guide to the meaning of a disputed term."  Id.

It is important to keep in mind that although the specification is highly relevant to determining the definition of terms used in the claims, the claims themselves define the precise scope of the patent.  Computer Docking Station Corp. v. Dell., 519 F.3d 1366, 1373 (Fed. Cir. 2008).  References in the specification to a particular or preferred embodiment or to an illustrative example do not limit the scope of the patent claim.  Specialty Composites v. Cabot Corp., 845 F.2d at 981, 987 (Fed Cir. 1988).  "The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims."  Markman, 52 F.3d at 980.  Thus, the fact that a particular embodiment disclosed in the specification is narrower than a claim does not mean that the claim should be limited to that particular embodiment.  See Phillips v. AWH Corp. 415 F.3d 1303 (Fed. Cir. 2005) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

A district court may also rely on extrinsic evidence, which consists of all evidence, external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.  Phillips, 415 F.3d at 1317. In Phillips, the Federal Circuit explained that extrinsic evidence, such as dictionaries, treatises, and expert testimony, can be useful to a court to provide background on the technology at issue, to explain how an invention works, and to

ensure that the court's understanding of the technical aspects of the patent is consistent with the meaning assigned by one skilled in the art.  Id.  at 1318. Although extrinsic evidence can be useful, it is also less reliable than that patent itself and the prosecution history.  Thus, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."  Id. at 1319.  The Circuit has cautioned that, "judges are free to consult dictionaries and technical treatises 'at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'"  Id. at 1322-23 (quoting Vitronics, 90 F.3d at 1584 n.6).

**Means-Plus-Function Claims**

Pursuant to § 112, ¶ 6 of the Patent Act, an inventor may claim an element of the invention in terms of its function.  See 35 U.S.C. § 112(6).  The so-called "means-plus-function" claim limitation provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. In construing means-plus-function claim limitations, a court must first define the particular function claimed. Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1428 (Fed. Cir. 1997). Then, the court must identify "the corresponding structure, material, or acts described in the specification." 35 U.S.C. § 112, ¶ 6; see Sage Prods., 126 F.3d at 1427.

Use of the word "means" gives rise to "a presumption that the inventor used the term advisedly to invoke the statutory mandates for means-plus-function clauses." Sage Prods., 126 F.3d at 1427. However, the presumption is not conclusive. For example, where a claim uses the word "means," but specifies no corresponding function for the "means," it does not implicate section 112. Id. Likewise, where a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format. Id.

Once the Court determines that the claim term invokes § 112, ¶ 6, two steps are required to construe the term. First, the Court must identify the claimed function. See Intellectual Prop. Div., Inc. v. UA-Columbia Cable Vision of Westchester, Inc., 336 F.3d 1308, 1319 (Fed. Cir. 2003). Second, the Court must identify "the corresponding structure, material or acts described in the specification" that perform the function. Id. The claim limitation is then construed to mean the corresponding structure, as well as statutory equivalents. See 35 U.S.C. § 112, ¶ 6. Failure to disclose adequate structure corresponding to the

recited function results in the claim being of indefinite scope, and thus invalid,

under § 112, ¶ 2. <u>Intellectual Prop. Div.</u>, 336 F.3d at 1319.

The Court will now construe the disputed terms in light of the foregoing

principles.


**III.** **Disputed Terms - '237 Patent**

The parties dispute the following terms set forth in bold in Claim 1 of the

'237 patent:

1. In combination with a bridge having a deck, a platform disposed below said bridge deck and attached to said bridge and extending along a portion of the bridge for supporting persons performing work on the bridge portion and for collecting debris resulting from the work, the platform comprising:

   a) a plurality of cables extending along said bridge and in spaced relation to each other and in a plane substantially parallel to the plane of said bridge deck;

   b) **means at each end of said cables for securing said cables to said bridge** so that the plane of the cables is at a desired distance below the bridge portion;

   c) a floor comprising a plurality of flooring panels each extending transversely of said cables and resting on said cables, each of said panels having at least one **means defining an opening therein**; and

   d) **means for releasably securing said flooring panels to said cables** so that said flooring panels are individually removable from said floor and so that the platform may be repeatedly assembled and disassembled, said releasably securing means including

a member extending through each of said opening means and having a portion which is shaped to define with said respective panel an eyelet, said opening means being sized for passage therethrough of said eyelet portion, and said cables passing through respective ones of said eyelets.

1.  ***"means at each end of said cables for securing said cables to said bridge"***

As to this claim term, the parties agree that the means-plus-function limitation applies. They also agree that the function disclosed is securing cables to the bridge. However, they disagree as to the structure needed to perform that function. Safespan argues that the structure to perform that function can be either: "(a) an opening or connector and (b) a cable clamp/clip and/or vertical support cable, and all equivalents thereof," whereas EZ Access argues that the structure disclosed in the specification is "compression clamp assembles which utilize a plurality of threaded connecting rods which are tightened to provide the required amount of compression force."

The Court finds that the specification discloses two distinct means for securing cables to the bridge. First, the specification discloses what it identifies as the preferred embodiment - namely, compression clamp assemblies that are attached to the bridge piers. These compression clamp assemblies are "clamped to the pedestal by a plurality of threaded connecting rods which are tightened to

provide the required amount of compression force." See '237 Patent, Col. 4, lines 2-5. The specification further discloses that the cable is connected to an I-beam by a "plate-like extrusion on the outer flange of the beam and a shackle which fits in an opening in the plate and is connected by a cable clamps [sic] to the end of the cable." Id. at lines 53-56.

The specification also discloses a second structure for securing the horizontal cables to the bridge involving the use of vertical ("auxiliary") cables that are attached to the bridge structure itself at one end, and to the horizontal cables at the other end, via an additional eyelet located on a "connector assembly" (sometimes called a "deck clip" by the parties). The specification discloses two types of connector assembly structures, the first type having only one eyelet and the second type having an additional eyelet "which is welded or otherwise joined . . . to surface of the body [of that connector assembly] at a location between opening and edge. [Said] [e]yelet receives one end of an additional or auxiliary supporting cable . . . the other end of which is secured to the bridge structural steel." See id., Col. 7 at lines 11-16; see also id. at Col. 6, lines 25-30 ("The second part of the connector assembly is provided with an eyelet for connection to one end of the auxiliary cable . . . the other end of which is connected to the bridge structural steel . . . ."); id. at Fig. 2 (depicting auxiliary or vertical cables (32) as attached to the structural steel of the bridge at one end and attached to the bridge platform at the other end); id. at Fig. 10 (depicting the connector

assembly with an additional eyelet (210) used to attach the auxiliary cables to the platform).

Because the specification discloses two distinct structures for securing cables to the bridge, the defendant's proposed construction - which limits the disputed phrase to only one of the two structures - is rejected. Rather, the Court finds that the "means at each end of said cables for securing said cables to said bridge" involves either: (1) a compression clamp structure that utilizes a plurality of threaded connecting rods which are tightened to provide the required amount of compression force; or (2) use of a connector assembly with two eyelets, whereby the second eyelet[2] is welded to the connector assembly, through which an auxiliary cable is passed at one end and the second end of the cable (which is hung vertically from the platform) is connected to the structural steel of the bridge, and all equivalents thereof.

Support for this construction is found in the specification. As noted, the specification discloses that the preferred embodiment for securing the cables to the bridge is via use of the compression clamp structures, see '237 Patent, Col. 1, lines 53-55, but also discloses that the cables could be secured to the bridge without the need for the clamping structures where the bridge has a large number of bearing structures per pier. Id. at Col. 5, lines 8-10; see also Col. 8, lines 1-5

---

[2] The first eyelet on this connector assembly is used to releasably secure the horizontal cable to the flooring panel.

(explaining that the second type of connector assemblies (with two eyelets) "are installed at spaced locations . . . over the surface of the platform, and auxiliary cables . . . are connected between the assemblies and the bridge structural steel.").

### 2. *"means defining an opening therein"*

Next, the parties dispute the term "means defining an opening therein" set forth in Claim 1(c) of the '237 patent. They also dispute whether the means-plus-function limitation applies to this term. Safespan argues that the claim is clear on its face, and that because no corresponding function for the means is disclosed, the means-plus-function limitation does not apply. Conversely, EZ Access argues that the mean-plus-function limitation does apply, and that the function is to "provide openings." It further argues that the term delineates "a plurality of openings" in each of the flooring panels.

The Court finds that the means-plus-function limitation does not apply to this disputed term because, contrary to the defendant's position, there is no function disclosed to correspond to the use of the word "means." See Wenger Mfg. Inc., v. Coating Machinery Sys., Inc., 239 F.3d 1225, 1232 (Fed Cir. 2001) ("[A] limitation that uses the word 'means' but does not recite a function that corresponds to the means does not invoke § 112, ¶ 6.").

Rather, the Court adopts plaintiff's proposed construction and finds that the

term "means defining an opening therein" simply means an "opening" in the flooring panel. This construction is consistent with the ordinary and customary meaning of the terms in the claim, and is consistent with the specification, which states that "[e]ach of the panels comprising flooring includes a plurality of openings extending therethrough for making connection to the cables." See '237 Patent, Col. 5. lines 60-62. Although the specification speaks to a "plurality of openings," it goes on to state that "[t]he number and location of openings will depend on the size of the panels and the distance between cables." Id. at lines 62-64.

The defendant's proposed construction (as a "plurality of openings"), seeks to import a limitation from the specification into the claim, and is inconsistent with the language of the claim itself. The claim requires that "each of said panels hav[e] *at least one* means defining an opening therein . . . . " To construe the disputed phrase as the defendant suggests (i.e., more than one opening) is to ignore the "*at least one*" language appearing before the disputed term. See '237 patent, Claim 1(c) (emphasis added). The claim provides that each panel must have "at least one" opening - it can have more, or it can have only one, but it must have *at least one* opening in each panel. Indeed, as the specification directs, the number of openings will depend upon the size of the panels and the distance between cables. Because defendant's proposed construction improperly incorporates limitations from the specification into the claim, it is rejected.

### 3. "means for releasably securing said flooring panels to said cables"

The parties also dispute whether the means-plus-function applies to the term "means for releasably securing said flooring panels to said cables" set forth in Claim 1(d) of the '237 patent. Defendant correctly notes that use of the term "means" along with the disclosure of a function invokes the presumption that § 112, ¶ 6 applies. See Envirco Corp. v. Clestra Cleanroom, Inc., 209 F.3d 1364-65 (Fed. Cir. 2000). Here, the stated function is a means for "releasably securing" the flooring panels to the cables, in other words, a "connectable, but detachable" method of securing the flooring panels to the cables. See P& M Products, Ltd. v. Rose Art Indus., No. CIV.A. 01-231, 2002 WL 461690 (E.D. Pa. March 21, 2002) (finding the term "releasably secured" to be unambiguous and construing it to mean "connectable, but detachable").

Although the plaintiff does not dispute that use of the term "means" invokes the presumption of means-plus-function treatment, the plaintiff argues that the presumption is overcome because the claim discloses sufficient structure for performing the stated function. The defendant disagrees that sufficient structure is disclosed and argues that means-plus-function treatment applies.

The Court finds that the disputed term discloses sufficient structure to perform the function of releasably securing the panels to the cables. The structure disclosed is as follows (with emphasis added):

17

> said releasably securing means including *a member*
> *extending through each of said opening means and having*
> *a portion which is shaped to define with said respective*
> *panel an eyelet, said opening means being sized for*
> *passage therethrough of said eyelet portion, and said*
> *cables passing through said respective one of said*
> *eyelets.*

The structure disclosed is a member having a portion which is shaped to define, together with a flooring panel, an eyelet, and where the opening in the panel is sized so that the eyelet may pass therethrough, and where the cable may pass through the eyelet. Where, as here, the claim recites a sufficiently definite structure for preforming the disclosed function, the means-plus-function limitation does not apply. <u>See</u> <u>Wenger Mfg.</u>, 239 F.3d at 1232.

EZ Access seeks to construe the disputed term as "a multi-piece assembly consisting of a multiple-piece plate and a U-shaped hook formation which extends therefrom for engaging a cable at a position below a flooring panel in close proximity to the flooring panel, which is provided with a threaded end portion which projects through an opening in the plate, with a nut fastening the parts together." <u>See</u> EZ Access Reply Constr. Memo. of Law, Dkt. 38, at 20. That proposed construction improperly reads limitations into the claim from the specification. As the Federal Circuit cautioned in <u>Phillips v. AWH Corp.</u>, 415 F.3d at 1323, courts must be careful to avoid reading limitations from the specification into the claim itself. While the specification does teach using a multiple-piece plate and a U-

shaped hook formation as a means for releasably securing the flooring panels to the cables, it is clear that the recitation of that structure in the specification is simply an example of one means to perform that function.  Contrary to the defendant's position, the structure in the claim is not limited to a multiple-piece plate and a U-shaped hook formation, nor is it limited to structures using a nut to fasten the parts together.   Therefore, the defendant's proposed construction is rejected.

Accordingly, the Court construes the disputed term as a connectable, but detachable, means for securing the cables to the bridge whereby a member extends through an opening in the flooring panel and is shaped to define an eyelet, and wherein the eyelet is sized so that a cable may pass through the eyelet, and where a cable passes through the eyelet.


## IV.   Disputed Terms - '240 Patent

With regard to the '240 patent, the parties dispute the terms set forth in bold below.

1.    In combination with a bridge having a deck, a platform disposed below said bridge deck and attached to said bridge and extending along a portion of the bridge for supporting persons performing work on the bridge portion and for collecting debris resulting from the work, the platform comprising:

a) a plurality of cables extending along said bridge and in spaced relation to each other and in a plane substantially parallel to the plane of said bridge deck;

b) **means at each end of said cables for securing said**

**cables to said bridge** so that the plane of the cables is at a desired distance below the bridge portion;

c) a floor comprising a plurality of flooring panels each extending transversely of said cables and resting on said cables, each of said panels having at least one **means defining an opening therein**; and

d) **means for releasably securing said flooring panels to said cables**, said releasably securing means including means defining eyelets on said flooring panels, each said opening at least partially receiving one of said eyelets, and said cables passing through respective ones of said eyelets on said flooring panels.

(emphasis added).

The first two disputed terms ("means at each end of the said cables for securing said cables to said bridge" and "means defining an opening therein") are identical to the claim terms disputed in the '237 patent. Further, the portions of the specification relating to those disputed terms are essentially identical to the specification of the '237 patent. Because the claim terms and specification portions relating thereto are identical, the Court finds it appropriate to adopt the same construction for those terms as was adopted for the '240 patent. Therefore, the term "means at each end of said cables for securing said cables to said bridge" found in the '240 patent shall have the same meaning as it does in the '237 patent, specifically a structure to preform the function of securing the cables to a bridge involving either: (1) a compression clamp structure that utilizes a plurality of threaded connecting rods which are tightened to provide the required amount of compression force; or (2) a connector assembly with two eyelets, whereby the

second eyelet[3] is welded to the connector assembly, through which an auxiliary cable is passed at one end and the second end of the cable (which is hung vertically from the platform) is connected to the structural steel of the bridge; and all equivalents thereof.

As to the disputed term "means defining an opening therein" found in Claim 1(c) of the '240 patent, the Court interprets that term to mean at least one opening in the flooring panel. Defendant's proposed construction of a "plurality of openings" is rejected for the reasons stated above.

As to the third disputed claim of the '240 patent - "means for releasably securing said flooring panels to said cables" – the structure disclosed in the claim is different from the structure disclosed in Claim 1 of the '237 patent and therefore, the Court will analyze the term independently of the '237 patent.

Because the term invokes "means" language, the presumption of § 112, ¶ 6 treatment applies. The function disclosed is a means for "releasably securing" the flooring panels to the cables. The Court construes the term "releasably securing" as a "connectable, but detachable" method of securing the flooring panels to the cables.

Notwithstanding the means-plus-function presumption, plaintiff argues that § 112, ¶ 6 does not apply because the claim discloses sufficient structure for

_____

[3] The first eyelet on this connector assembly is used to releasably secure the horizontal cable to the flooring panel.

preforming the stated function.  The structure disclosed is:

> said releasably securing means including means defining eyelets on
> said flooring panels, each said opening at least partially receiving one
> of said eyelets, and said cables passing through respective ones of
> said eyelets on said flooring panels.

The parties have stipulated that the term "means defining eyelets on said flooring panels" shall be construed as "two or more eyelets, each eyelet defined by a flooring panel and a portion of the connector assembly which extends through an opening in the flooring panel" and the Court will interpret that term as stipulated. The disclosed structure also requires that each opening in the flooring panel partially receive one of the eyelets on the connector assembly, and that the cables then pass through the eyelet.  The Court finds that the structure disclosed is sufficient to perform the function of releasably securing the flooring panels to the cables, and therefore § 112 ¶ 6 does not apply.

The defendant seeks to construe the disputed claim as "a multiple-piece assembly consisting of a multiple-piece plate and a U-shaped hook formation which extends therefrom for engaging a cable at a position below a flooring panel in close proximity to the flooring panel, and which is provided with a threaded end portion which projects through an opening in the plate, with a nut fastening the parts together."  As with defendant's construction of the '237 patent, the Court rejects this construction as it improperly incorporates limitations into the claim from the specification, namely that the structure includes a multiple-piece assembly

consisting of a multiple-piece plate and a U-shaped hook formation along with a nut fastening the parts together. Because the structure disclosed in the claim is sufficiently definite to perform the stated function, § 112, ¶ 6 does not apply and the defendant's attempt to read limitations from the specification into the claim is rejected.

Accordingly, the Court construes the disputed term as a connectable, but detachable means for securing the panels to the cables involving two or more eyelets, each eyelet defined by a flooring panel and a portion of the connector assembly, each of which eyelet extends through an opening in the flooring panel and whereby a cable passes through the eyelet.

## CONCLUSION

The disputed terms are construed as stated above. The parties shall appear for a status conference on **March 24, 2010**, at 9:00 a.m.


SO ORDERED.


s/ Richard J. Arcara
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: January 14, 2010