UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════════

SAFESPAN PLATFORM SYSTEMS, INC.,
        et al.,

                                    Plaintiffs,

                                                        **REPORT AND**
                                                        **RECOMMENDATION**

                v.                                      06-CV-726A

EZ ACCESS, INC. et al.,

                                    Defendants.

═══════════════════════════════════

## I.     INTRODUCTION

        This case was referred to this Court by the Hon. Richard J. Arcara on

November 28, 2006 (Dkt. No. 5).  Pending before the Court is a motion (Dkt. No.

182) by plaintiffs Safespan Platform Systems, Inc. ("Safespan"), Lambros

Apostolopoulos, and Paul Kristen Inc. for partial summary judgment against

defendants EZ Access, Inc. ("EZ"), Anastasios G. Hatsios, Bridgeplatforms, Inc.

("Bridgeplatforms"), George Hatsios, and Linda Lee Noltee, pursuant to Rule 56

of the Federal Rules of Civil Procedure ("FRCP").  Specifically, plaintiffs seek

summary judgment on their claim that defendants infringed their two patents for

bridge platform systems, U.S. Patent Nos. 6,135,240 (the "'240 Patent") and

6,302,237 (the "'237 Patent").  Plaintiffs have not differentiated between the

various corporate and individual defendants regarding infringement, and the

Court has assumed for this Report and Recommendation that plaintiffs seek to hold each defendant liable on all infringement allegations.  As a corollary to their request for summary judgment on infringement, plaintiffs also have asked the Court to dismiss defendants' Second Affirmative Defense and two Counterclaims. In the Second Affirmative Defense and the Counterclaims, defendants assert that they have not infringed plaintiffs' patents.  Finally, plaintiffs seek a declaration that defendant Bridgeplatforms is a successor to EZ and thus has to account for any liability assigned to EZ in this case.

Defendants counter that plaintiffs' motion papers are procedurally defective in several ways.  Defendants also assert that numerous questions of fact surround the application of plaintiffs' patent claims to their platform system and the relationship between Bridgeplatforms and EZ.  Defendants' argument includes the assertion that "[n]ot only have Plaintiffs failed to put forward any evidence of how customers actually use the Defendants' products—which of itself renders their motion fatally deficient—but also Plaintiffs surely are aware of the variety of platform structures and materials used in the industry and that the Markman Order contains no language whatsoever to support any contention that the claims of Plaintiffs' patents include any platform systems using materials or designs for the decking other than those of Plaintiffs which consist of the recited limitations."  (Dkt. No. 202-1 at 13.)  Because of these questions of fact, defendants argue, summary judgment would be inappropriate.

2

The Court held oral argument on March 16, 2012.  For the reasons below, the Court respectfully recommends granting plaintiffs' motion in part as follows: 1) granting the motion to find literal or equivalent infringement of the '240 Patent and '237 Patent by defendant Bridgeplatforms; 2) granting the motion to dismiss defendants' Second Affirmative Defense as to defendant Bridgeplatforms; and 3) granting the motion to dismiss defendants' two Counterclaims as to defendant Bridgeplatforms.  The Court recommends denying plaintiffs' motion to the extent that it seeks any other relief.

## II.    BACKGROUND

### A.    *Generally*

This case is nearly six years old and has been the subject of extensive litigation and prior orders from Judge Arcara and this Court.  The Court thus will not repeat the facts more than necessary to address plaintiffs' pending motion.  Briefly, though, this case concerns allegations that defendants broke away from plaintiffs to start rival companies that sold a rival product that infringed on plaintiffs' patents.  The product in question is a bridge platform system.  In common language, plaintiffs' bridge platform system is a system that uses vertically and horizontally arranged steel cables to support a removable platform under the deck of a bridge.  The platform comprises modular floor panels of corrugated steel.  Various types of clamps connect the floor panels to the horizontal cables, the vertical and horizontal cables to each other and to piers on

the bridge, and the vertical cables to the deck of the bridge.  The abstract of each

of plaintiffs' patents summarizes plaintiffs' bridge platform system a little more

technically as follows:[1]

> A bridge platform and method of erecting the same wherein a
> plurality of cables extend longitudinally of the bridge in spaced
> relation below the deck or roadway and steel support structure of the
> bridge, which cables are supported at opposite ends by the
> spaced-apart vertical piers of the bridge, and wherein a plurality of
> platform flooring panels or sections are supported on the cables,
> extend laterally of the bridge, are arranged side-by-side along the
> length of the bridge between the piers and are removably secured to
> the cables.  The cables are attached to the bridge piers by
> compression clamp structures.  The platform flooring sections
> comprise elongated rectangular corrugated decking panels and are
> arranged in end-to-end overlapping relation transversely of the
> bridge, side-to-side overlapping relation longitudinally along the
> bridge and with the corrugations extending transversely of the
> cables.  The corrugations maximize the strength-to-weight ratio of
> the platform flooring and provide recesses or receptacles to contain
> debris and facilitate its collection and removal.  Each of the platform
> flooring sections is releasably connected at spaced locations to the
> supporting cables on which it rests.  This is provided by connector
> assemblies each comprising a first part which engages the upper
> surface of the flooring section and the cable and a second part which
> engages the upper surface of the flooring section, the two parts
> being removably connected together through a small opening in the

―――――――――――――――――

[1] The Court briefly notes two points in quoting from the abstract of plaintiffs'
patents.  First, the Court quotes the abstract only once because the abstracts
from both patents are exactly identical.  (*Compare* Dkt. No. 50-2 at 1 *with* Dkt.
No. 50-3 at 1.)  Second, the Court quotes language outside of the claims as a
concise summary of both patents and for background purposes only; it realizes
that only the language of the claims controls when determining infringement.  *See
SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en
banc) ("It is the *claims* that measure the invention.").

flooring.  As a result, individual flooring sections can be removed to provide access through the flooring in emergency or critical situations while at the same time allowing the remainder of the flooring to retain collected debris.

(Dkt. No. 50-2 at 1; Dkt. No. 50-3 at 1.)  In the background section of each patent,

plaintiffs described their motive to design their bridge platform system as follows:

This invention relates to the art of working platforms for supporting persons performing work on structures, and more particularly to a new and improved platform installed below the deck or roadway of a bridge.

It is necessary to periodically clean and repaint the surfaces of steel bridges to prevent corrosion and deterioration of the steel supporting structure.  This, in turn, creates the need to provide a safe and effective support for workmen performing the cleaning and painting of the surfaces beneath the deck or roadway of the bridge. In addition, environmental concerns and regulations give rise to the need for containing the debris from the cleaning operation as well as paint residue and spillage.

A number of bridge platforms have been proposed but many are complex structures and time consuming to erect and dismantle. Other prior art platforms are not sufficiently rigid or are limited in height, i.e., the distance between platform flooring and bridge steel structure, due to the manner in which they are attached to the bridge. Some prior platforms extend for only a short distance longitudinally of the bridge and are limited in that respect.

It would, therefore, be highly desirable to provide a new and improved bridge platform and method of erecting the same which is safe, provides a sufficiently rigid support for workman standing and walking thereon, which is simple in structure, light in weight, and therefore quick, easy and economical to erect and dismantle, which extends for a significant portion of the length of the bridge and which is effective in containing debris from the cleaning and painting operations performed on the bridge.

(Dkt. No. 50-2 at 10; Dkt. No. 50-3 at 10.)

The histories of the corporate parties on each side are somewhat intertwined.  Defendant Anastasios Hatsios ("Hatsios") worked for plaintiff Safespan from 1995 until he left on January 19, 2003.  On January 29, 2003, Hatsios signed a patent application for a bridge platform system, a system that plaintiffs allege infringes on their patents.  On February 6, 2003, Hatsios filed the patent application.  The record is not clear as to what ultimately happened to this patent application.  On March 10, 2003, Hatsios registered EZ with the New York Department of State.[2]  Hatsios then worked for Bridgeplatforms, which came into being around November 2008.  (*See* Dkt. No. 184-4 at 1.)[3]  Defendant Noltee, Hatsios's sister, is president of Bridgeplatforms and performed bookkeeping services for EZ.  At Bridgeplatforms, Noltee handles "[a]ll of the office work, invoicing, statements, paying bills, preparing paychecks, answering the phone, overseeing the girls we have in the office, shopping, cleaning.  Pretty much everything in the office."  (Dkt. No. 184-5 at 2.)

---

[2] The Court takes judicial notice that the New York Department of State website lists March 10, 2003 as the filing date for EZ Access, Inc. and lists January 26, 2011 as the date of "Dissolution by Proclamation / Annulment of Authority."  *See* Dep't of State Business Entity Database, *available at* http://www.dos.ny.gov/corps/bus_entity_search.html, search string "ez access" for all status types (last visited June 19, 2012).

[3] The Court takes judicial notice that the New York Department of State website lists October 22, 2008 as the filing date for Bridgeplatforms, Inc. and lists the entity as "Active."  *See* Dep't of State Business Entity Database, *available at* http://www.dos.ny.gov/corps/bus_entity_search.html, search string "bridgeplatforms" for all status types (last visited June 19, 2012).

Like Safespan, Bridgeplatforms markets a bridge platform system. Bridgeplatforms markets its system with the help of an installation booklet and hardware catalog that it distributes on request.  (*See generally* Dkt. No. 186, App. A and B.)  The installation booklet announces the Bridgeplatforms system as "[t]he most versatile cost effective bridge under deck protection platform on the market today!"  (Dkt. No. 186-1 at 3.)  Bridgeplatforms designed its platform system in such a way that "large crews of multiple trades can work easily to help you get the job done fast."  (*Id.*)  With respect to the use of cables in its platform system, Bridgeplatforms states that its system contains "[v]ertical support cables [that] are installed at measured intervals according to the engineers['] instructions for the desired platform capacity."  (*Id.* at 8.)  "To achieve this[,] steel wire rope cable is tied to the main cable at spaced intervals and pulled up vertically and attached to the bridge."  (*Id.* at 10.)  With respect to securing cables to a bridge, Bridgeplatforms's system offers several options that "range from wrapping the cable around the bridge shoes to bolting Anchor Plates to the concrete abutments."  (*Id.* at 9.)  As for the platform floor, Bridgeplatforms's system contains "modular panels [that] are laid down into place to create the desired size and shape platform floor."  (*Id.* at 7.)  Through the installation booklet, Bridgeplatforms instructs customers to lay floor panels down "one at a time" and to line up slotted holes for attachment of hold-down clips that secure horizontal cables.  (*Id.* at 35–40.)

The individual defendants have testified about the Bridgeplatforms system in ways that allow for a comparison to the Safespan system.  At his deposition, for example, Hatsios answered questions about flooring in the Bridgeplatforms system as follows:

> Q. Okay. And this is corrugated decking, correct?  Correct?
> A. Yes.  Yes.
> Q. And do you sell in it rectangular panels?
> A. Pardon me?
> Q. Do you sell in it rectangular panels?
> A. Yes. Yes.
> Q. Okay. And you mentioned holes?
> A. Yes.
> Q. There are openings for the deck clips to pass through, correct?
> A. Correct.
> Q. And do you use the deck clips to secure this decking to the main cables?
> A. Correct.
> Q. And this corrugated decking rests on top of the main cables, correct?
> A. Correct.
> Q. And how do the cables run? Do they run parallel to the corrugation lines or across the corrugation?
> A. Across the corrugation.

(Dkt. No. 184-1 at 12.)  Hatsios also testified about a continuation of business from EZ to Bridgeplatforms, as follows:

> Q. Is the business of Bridge Platforms, Inc., different in any way from the business of EZ Access, Inc.?
> A. No.
> Q. You sell the same—very same products?
> A. The exact same products.
> Q. And use the same equipment?
> A. Yes.
> Q. And the same brochures?
> A. Yes.

> Q. And provide the same services?
> A. Yes.

(Dkt. No. 184-4 at 12.)  Noltee, however, offered a more ambiguous comparison

at her deposition:

> Q. Bridgeplatforms, Inc., is in the same line of business as EZ
>     Access, correct?
> A. Correct.
> Q. Sell all the same products?
> A. Different products.
> Q. What products—
> A. Some similar.
> Q. What products are different?
> A. The new products that my father's developed.

(Dkt. No. 184-5 at 6.)

Based on the information that they have gathered in this litigation, plaintiffs

filed a First Amended Complaint on June 23, 2009 (Dkt. No. 50).  The First

Amended Complaint contains two causes of action, one for each of plaintiffs'

patents.  In each cause of action, plaintiffs accused defendants collectively of

actual infringement and infringement inducement.  On December 1, 2010,

defendants filed a corrected Second Amended Answer (Dkt. No. 91).  The

Second Amended Answer includes a Second Affirmative Defense that

"Defendants have not infringed United States Patent Number 6,135,240 and have

not infringed United States Patent Number 6,302,237."  (Dkt. No. 91 at 3.)  The

Second Amended Answer also contains two Counterclaims, one for each of

plaintiffs' patents.  In each Counterclaim, defendants collectively request

9

declaratory judgment that they have not infringed plaintiffs' patents and that

plaintiffs' patents are "invalid, void and unenforceable" anyway.

Judge Arcara previously upheld the validity of plaintiffs' patents against

various challenges that defendants made.  (*See generally* Dkt. No. 177, adopting

Report and Recommendation at Dkt. No. 150.)

### B.   Markman *Order*

During the course of this litigation, the parties disagreed over the

construction of certain claims in plaintiffs' patents.  Consequently, Judge Arcara

held a claim-construction hearing on May 13, 2009, pursuant to *Markman v.*

*Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir.1995).  In a Decision and

Order dated January 14, 2010 (the "*Markman* Order"), Judge Arcara construed

several disputed claims as follows:

1.   In claim 1(b) of each patent, "'means at each end of said

cables for securing said cables to said bridge' involves either:

(1) a compression clamp structure that utilizes a plurality of

threaded connecting rods which are tightened to provide the

required amount of compression force; or (2) use of a

connector assembly with two eyelets, whereby the second

eyelet is welded to the connector assembly, through which an

auxiliary cable is passed at one end and the second end of the

cable (which is hung vertically from the platform) is connected

10

to the structural steel of the bridge, and all equivalents thereof."  (Dkt. No. 54 at 14 ('237 Patent); *see also id.* at 20 (extending the construction to identical language in the '240 Patent).)

2.      In claim 1(c) of each patent, "'means defining an opening therein' simply means an 'opening' in the flooring panel . . . . The claim provides that each panel must have 'at least one' opening—it can have more, or it can have only one, but it must have *at least one* opening in each panel."  (*Id.* at 16 ('237 Patent); *see also id.* at 20 (extending the construction to identical language in the '240 Patent).)

3.      In claim 1(d) of the '237 Patent, "means for releasably securing said flooring panels to said cables" means "a connectable, but detachable, means for securing the cables to the bridge whereby a member extends through an opening in the flooring panel and is shaped to define an eyelet, and wherein the eyelet is sized so that a cable may pass through the eyelet, and where a cable passes through the eyelet."  (*Id.* at 19.)

4.      In claim 1(d) of the '240 Patent, "means for releasably securing said flooring panels to said cables" means "a

11

> connectable, but detachable means for securing the panels to
> the cables involving two or more eyelets, each eyelet defined
> by a flooring panel and a portion of the connector assembly,
> each of which eyelet extends through an opening in the
> flooring panel and whereby a cable passes through the
> eyelet." (*Id.* at 23.)

## C.    *Pending Motion*

Plaintiffs filed the pending motion on January 27, 2012, seeking various types of relief that relate to a declaration that defendants infringed their patents. Plaintiffs also seek a declaration that Bridgeplatforms inherited any liability that EZ incurred in this case.  In support of their motion, plaintiffs have submitted copies of their patents and of the Bridgeplatforms installation booklet and hardware catalog.  As seen by the extensive citation to those documents in the motion papers and the chart-like comparison of those documents in their memorandum of law (Dkt. No. 186), plaintiffs rely almost exclusively on those documents to compare the Bridgeplatforms system to their own and to establish infringement.  Plaintiffs also have attached certain deposition excerpts to establish that all of the defendants are liable for infringement and that Bridgeplatforms is a corporate successor to EZ.  Other than the deposition transcript excerpts, plaintiffs have not provided any documentation of any bridge platform systems that EZ may have developed or sold.

In opposition to the pending motion, defendants do not address plaintiffs' comparison chart directly.  Rather, defendants challenge plaintiffs' statement of undisputed facts as procedurally defective for being conclusory and for leaving out details about components of the Bridgeplatforms system.  Defendants argue further that numerous issues of fact exist concerning their defense that plaintiffs committed fraud on the United States Patent and Trademark Office ("USPTO"); the information raised in the depositions that certain components of Bridgeplaforms's system have been updated since the litigation began; and the possibility of non-infringing uses for certain components of Bridgeplatforms's system.

## III.   DISCUSSION

### A.    *Summary Judgment Generally*

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FRCP 56(a).  "A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made

for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." FRCP 56(c)(1)(A).

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

Summary judgment in the specific context of patent infringement requires the same general analysis. "It is well established that determining infringement is a two-step process. First, the meaning and scope of the relevant claims must be ascertained. Second, the properly construed claims must be compared to the accused device." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,

14

381 F.3d 1111, 1115 (Fed. Cir. 2004) (citations omitted).[4]  Summary judgment for

patent infringement is not appropriate if "no reasonable jury could find, either

literally or by application of the doctrine of equivalents, each and every limitation

recited in the properly construed claims in the accused device."  *Id.*

## B.    *Claim Application and Infringement Generally*

"Except as otherwise provided in this title, whoever without authority

makes, uses, offers to sell, or sells any patented invention, within the United

States or imports into the United States any patented invention during the term of

the patent therefor, infringes the patent." 35 U.S.C. § 271(a).  "Infringement,

literal or by equivalence, is determined by comparing an accused product not with

a preferred embodiment described in the specification, or with a commercialized

embodiment of the patentee, but with the properly and previously construed

claims in suit."  *SRI*, 775 F.2d at 1121 (citations omitted).  "If the claims read

literally on the accused structures, an initial hurdle in the test for infringement has

been cleared . . . . And since the law is to benefit the inventor's genius and not

the scrivener's talents, claims must not only read literally on the accused

structures, but also the structures must do the same work, in substantially the

same way, and accomplish substantially the same result."  *Autogiro Co. of Am. v.*

––––––––––––––––––––

[4] The Court will cite to Federal Circuit cases for substantive law, and not
Second Circuit cases, because "The United States Court of Appeals for the
Federal Circuit shall have exclusive jurisdiction . . . of an appeal from a final
decision of a district court of the United States . . . in any civil action arising under
. . . any Act of Congress relating to patents . . . ." 28 U.S.C. § 1295(a)(1).

*U.S.*, 384 F.2d 391, 399–400 (Ct. Cl. 1967)[5] (internal quotation marks and citation omitted).  "If the claims do not read literally on the accused structures, infringement is not necessarily ruled out.  The doctrine of equivalence casts around a claim a penumbra which also must be avoided if there is to be no infringement.  It provides that a structure infringes, without there being literal overlap, if it performs substantially the same function in substantially the same way and for substantially the same purpose as the claims set forth."  *Id.* (citations omitted).

### C.   *Infringement of the '240 and '237 Patents*

With the above principles in mind, the Court now reviews the patent claims that plaintiffs cited in their motion.

#### 1.   **Claim 1 of '240 Patent**

Claim 1 of the '240 Patent consists of a general description of a bridge platform followed by four sub-paragraphs that describe the components of the platform in more detail.  Claim 1 reads in its entirety as follows (language in boldface is language that Judge Arcara interpreted in the *Markman* Order):

> In combination with a bridge having a deck, a platform disposed below said bridge deck and attached to said bridge and extending along a portion of the bridge for supporting persons performing work on the bridge portion and for collecting debris resulting from the work, the platform comprising:

---

[5] The former United States Court of Claims was abolished by the Federal Courts Improvement Act of 1982, Pub. L. 97–164, 96 Stat. 25 (1982), which also created the Federal Circuit.

a) a plurality of cables extending along said bridge and in spaced relation to each other and in a plane substantially parallel to the plane of said bridge deck;

b) **means at each end of said cables for securing said cables to said bridge** so that the plane of the cables is at a desired distance below the bridge portion;

c) a floor comprising a plurality of flooring panels each extending transversely of said cables and resting on said cables, each of said panels having at least one **means defining an opening therein**; and

d) **means for releasably securing said flooring panels to said cables**, said releasably securing means including means defining eyelets on said flooring panels, each said opening at least partially receiving one of said eyelets, and said cables passing through respective ones of said eyelets on said flooring panels.

(Dkt. No. 50-2 at 13–14.)

Undisputed documentary evidence shows the extent to which Bridgeplatforms's system includes each and every element, limitation, and feature of Claim 1.  As cited above, Bridgeplatforms has an installation booklet and hardware catalog that it uses to market its platform system.  The installation booklet and hardware catalog describe the system in considerable detail.  According to these documents, Bridgeplatforms's system is a platform system designed to let work crews work under the deck of a bridge.  Bridgeplatforms's system accomplishes this goal by attaching regularly spaced steel cables to the bridge deck and running them down vertically to a uniform distance under the deck.  Under the deck, the vertical steel cables connect to piers of the bridge and to a network of horizontal steel cables by way of compressor clamps and other

clamps that hook into eyelets at the ends of the cables.  The compressor clamps hold up the horizontal steel cables, which form a grid under the bridge deck that can support modular, corrugated steel panels that come together to form a platform.  The steel panels have holes that allow fastener clips to fasten the panels to the horizontal cables.  The overall system is entirely removable once the work crew has finished its tasks.  In short, the Bridgeplatforms system mimics everything that plaintiffs contemplated when they set forth Claim 1.  If a reasonable jury read Claim 1 first and then, hypothetically, read a copy of the Bridgeplatforms installation booklet and hardware catalog with the word "Bridgeplatforms" redacted, then it would conclude that plaintiffs wrote those documents.  No reasonable jury could conclude otherwise.  At no time, in fact, has Bridgeplatforms submitted any evidence that would at least raise questions for a reasonable jury about whether any aspect of the structure, function, or components of its platform system falls outside of the language of Claim 1.  Given that defendants previously failed to meet their burden to challenge the validity of plaintiffs' patents, the language of Claim 1 controls.

Bridgeplatforms's attempts to raise issues of fact by distinguishing minor features and by alleging non-infringing uses misses the point of the required claim-application analysis.  Bridgeplatforms officials have testified in depositions that, while its system performs as plaintiffs' does, some components can have minor differences in features.  Bridgeplatforms also has submitted papers in

opposition to this motion that describe allegedly non-infringing ways to use parts of its platform system.  (*See, e.g.*, Dkt. No. 202 at 2–6.)  At the very most, however, Bridgeplatforms has highlighted minor alternatives in its system that fall under the doctrine of equivalents.  For example, the match between Bridgeplatforms's overall system and Claim 1 does not change simply because one type of clamp in the overall system happens to be a hinged "J-Clip" or a newer "O-Clip."[6]  "Infringement is not determined by comparison between parts of the description in a patent and the accused process or product, or by comparison between commercial products sold by the parties."  *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481–82 (Fed. Cir. 1984); *cf. Acme Highway Prods. Corp. v. D.S. Brown Co.*, 473 F.2d 849, 855 (6th Cir. 1973) ("An accused device cannot escape infringement by merely adding features, if it otherwise has adopted the basic features of the patent.") (citation omitted).  None of the information that Bridgeplatforms has submitted changes what its system is compared to the language of Claim 1.  Claim 1 describes a bridge platform system that uses vertical cables, horizontal cables, and modular panels to create a temporary work platform for performing various types of bridge work.  Bridgeplatforms's system

---

[6] The Court takes judicial notice that the USPTO website lists that the USPTO issued Patent No. 8,186,024 to two of the individual defendants on May 29, 2012.  That patent is titled, "O-Clip Vertical Support Fastener."  *See* USPTO Full-Text and Image Database, *available at* http://patft.uspto.gov/netahtml/PTO/srchnum.htm, search string "8186024" (last visited June 19, 2012).

does exactly that, and the ability to use some components in other ways does not nullify the match to the language of Claim 1.  *Cf. Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607 (1950) ("[C]ourts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing.  Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law.").

In contrast, though, plaintiffs have not submitted any information in support of their motion that eliminates questions of fact for any defendants other than Bridgeplatforms.  Plaintiffs rest their motion almost exclusively on the Bridgeplatforms installation booklet and hardware catalog.  The largest section of plaintiffs' memorandum of law consists of just a chart that compares their patents to the installation booklet and hardware catalog.  Beyond some verbal descriptions in some deposition excerpts, plaintiffs have not provided any information, let alone definitive information, that depicts and details any platform system that EZ sold before it ceased operations.  Verbal descriptions that the EZ and Bridgeplatforms systems are "the same" are not enough to declare categorically that a trial is not necessary.  Additionally, questions of fact remain regarding the exact roles that the individual defendants played in creating

platform systems that infringed plaintiffs' patents.  Plaintiffs have not even

mentioned in their motion papers what ultimately happened to Hatsios's 2003

patent application.  A denial by the USPTO for reasons related to an overlap with

plaintiffs' patents might help plaintiffs' case against the other defendants, while a

grant might weaken it.  Reasonable jurors could come to different conclusions

about the credibility of the individual defendants and possibly other witnesses

with respect to platform system design, motive to commit infringement, and

inducements to infringement.  The Court thus declines to recommend summary

judgment against any defendant other than Bridgeplatforms.

For the above reasons, no reasonable jury could declare at trial that

Bridgeplatforms's system does not contain a platform, does not attach to a

bridge, does not contain vertical and horizontal cables, or does not contain

removable floor panels.  Without a genuine issue concerning any of the language

of Claim 1, convening a jury for that issue would serve no purpose.  The Court

thus respectfully recommends granting plaintiffs' motion for summary judgment

against Bridgeplatforms only, with respect to infringement of Claim 1 of the '240

Patent.

## 2.    Claim 11 of the '240 Patent

Claim 11 of the '240 Patent is similar to Claim 1.  Claim 11 consists of a

general description of a bridge platform system to support work crews, followed

by three sub-paragraphs that describe the components of the platform in more

detail.  Claim 11 reads in its entirety as follows:

> A method for supporting persons performing work on a portion of a
> bridge comprising installing a platform below a deck of the
> bridge and supporting the persons on the platform, the step of
> installing the platform comprising the sub-steps of:
> a) securing a plurality of cables to the bridge so that the cables
> extend along the bridge in spaced relation to each other and in
> a plane substantially parallel to the bridge deck at a selected
> distance below the bridge portion;
> b) erecting a floor on the cables, the step of erecting the floor
> comprising resting on the cables a plurality of flooring panels
> each having at least one opening therein so that the flooring
> panels extend transversely of the cables; and
> d)[7] releasably securing the flooring panels to the cables, said
> sub-step of releasably securing the flooring panels including at
> least partially receiving in each of the openings and attaching
> to the respective flooring panel structure forming an openable
> eyelet, receiving the cables in the eyelets respectively while
> the eyelets are open, and closing the eyelets.

(Dkt. No. 50-2 at 14.)

As with Claim 1, undisputed evidence from Bridgeplatforms's own

documents show how each and every element, limitation, and feature of Claim 11

appear in Bridgeplatforms's system.  Based on its installation booklet and

hardware catalog, with some support from deposition testimony, Bridgeplatforms

does not dispute that its system consists of a modular platform built from flooring

panels to help work crews work under bridges.  Bridgeplatforms's system uses

regularly spaced vertical and horizontal cables to fasten the platform to a bridge.

---

[7] So in original.  The section probably should be labeled c).

Bridgeplatforms's floor panels have openings to allow horizontal cables and clips to secure the completed platform.  To the extent that Bridgeplatforms sometimes uses platforms without openings, the system has other ways to support those platforms that fall under the doctrine of equivalents.  In opposition to plaintiffs' motion, Bridgeplatforms again tries to raise issues of fact about non-infringing uses for components of its system.  At no time, however, has Bridgeplatforms submitted evidence suggesting that its system is something other than a bridge platform system that uses vertical and horizontal cables, modular floor panels, and clamping or fastening equipment to create temporary, flexible work platforms under bridges.

For purposes of determining infringement of Claim 11 by Bridgeplatforms, the lack of distinguishing evidence is decisive.  A trial is not necessary here because no reasonable jury could review Bridgeplatforms's system and decide that it falls outside of the scope of Claim 11.  As with Claim 1 of the '240 Patent, though, issues of fact surround whether any other defendants have committed infringing acts.  The Court thus respectfully recommends granting plaintiffs' motion for summary judgment against Bridgeplatforms only, with respect to infringement of Claim 11 of the '240 Patent.

### 3.    Claim 1 of the '237 Patent

Claim 1 of the '237 patent is nearly identical to Claim 1 of the '240 Patent. Claim 1 consists of a general description of a bridge platform followed by four

sub-paragraphs that describe the components of the platform in more detail.

Claim 1 reads in its entirety as follows (language in boldface is language that

Judge Arcara interpreted in the *Markman* Order):

> In combination with a bridge having a deck, a platform disposed
> below said bridge deck and attached to said bridge and
> extending along a portion of the bridge for supporting persons
> performing work on the bridge portion and for collecting debris
> resulting from the work, the platform comprising:
> a) a plurality of cables extending along said bridge and in spaced
> relation to each other and in a plane substantially parallel to
> the plane of said bridge deck;
> b) **means at each end of said cables for securing said cables to
> said bridge** so that the plane of the cables is at a desired
> distance below the bridge portion;
> c) a floor comprising a plurality of flooring panels each extending
> transversely of said cables and resting on said cables, each of
> said panels having at least one **means defining an opening
> therein**; and
> d) **means for releasably securing said flooring panels to said
> cables** so that said flooring panels are individually removable
> from said floor and so that the platform may be repeatedly
> assembled and disassembled, said releasably securing means
> including a member extending through each of said opening
> means and having a portion which is shaped to define with
> said respective panel an eyelet, said opening means being
> sized for passage therethrough of said eyelet portion, and said
> cables passing through respective ones of said eyelets.

(Dkt. No. 50-3 at 14.)

For the sake of brevity, the Court incorporates its analysis from above and

applies it to this claim as well.  Bridgeplatforms complained about the vagueness

of the claim and of the *Markman* Order, but Judge Arcara rejected attacks on the

validity of the patents already.  What information Bridgeplatforms submitted in

opposition to the pending motion mentions minor differences in individual components of its system and other ways to use those components.  None of that information would lead a reasonable jury to conclude that Bridgeplatforms's system is something other than a platform system that uses regularly spaced cables to support a modular platform for work crews working under a bridge, which is exactly what Claim 1 of the '237 Patent describes.  As with the other claims, however, a reasonable jury would have to sort through conflicting or incomplete evidence of infringing conduct by the other defendants.  The Court thus respectfully recommends granting plaintiffs' motion for summary judgment against Bridgeplatforms only, with respect to infringement of Claim 1 of the '237 Patent.

### 4.    Claim 10 of the '237 Patent

Claim 10 of the '237 Patent is similar to Claim 11 of the '240 Patent.  Claim 10 consists of a general description of a bridge platform system to support work crews, followed by three sub-paragraphs that describe the components of the platform in more detail.  Claim 10 reads in its entirety as follows:

> A method for supporting persons performing work on a portion of a bridge comprising installing a platform below a deck of the bridge and supporting the persons on the platform, the step of installing the platform comprising the sub-steps of:
> a) securing a plurality of cables to the bridge so that the cables extend along the bridge in spaced relation to each other and in a plane substantially parallel to the bridge deck at a selected distance below the bridge portion;

      b) erecting a floor on the cables, the step of erecting the floor
             comprising resting on the cables a plurality of flooring panels
             each having at least one opening therein so that the flooring
             panels extend transversely of the cables; and
      d)[8] releasably securing the flooring panels to the cables so that said
             flooring panels are individually removable from said floor and
             so that the platform may be repeatedly assembled and
             disassembled, said sub-step of releasably securing the
             flooring panels including passing through each of the openings
             a second portion of a member which is shaped to form with
             said respective panel an openable eyelet so that a first portion
             of the member is at least partially received in the respective
             opening, receiving the cables in the eyelets respectively while
             the eyelets are open, and attaching the first member portions
             to the panels respectively to close the eyelets.

(Dkt. No. 50-3 at 14.)

For the sake of brevity, the Court incorporates its prior analysis and applies

it to this claim as well.  Bridgeplatforms failed previously to meet its burden of

showing invalidity and cannot attack the patents or the *Markman* Order

further—except, of course, through a post-judgment appeal.  What information

Bridgeplatforms has submitted in opposition to the pending motion mentions

minor differences in individual components of its system and other ways to use

that system.  None of that information would lead a reasonable jury to conclude

that Bridgeplatforms's system is something other than a platform system that

uses regularly spaced cables to support a modular platform for work crews

working under a bridge, which is exactly what Claim 10 describes.  As with the

other claims, plaintiffs have not submitted undisputed information regarding how

---

[8] So in original.  The section probably should be labeled c).

the other defendants may have infringed their patents.  The Court thus respectfully recommends granting plaintiffs' motion for summary judgment against Bridgeplatforms only, with respect to infringement of Claim 10 of the '237 Patent.

### D.   *Dismissal of Second Affirmative Defense*

The Court's recommendation of summary judgment for infringement necessitates a recommendation of dismissal of defendants' Second Affirmative Defense as to Bridgeplatforms.  The Second Affirmative Defense, in full, states that "[d]efendants have not infringed United States Patent Number 6,135,240 and have not infringed United States Patent Number 6,302,237."  (Dkt. No. 91 at 3.) Logically, if Judge Arcara grants summary judgment against Bridgeplatforms on infringement then allowing Bridgeplatforms to proceed with its Second Affirmative Defense would contradict that ruling.  Accordingly, this Court respectfully recommends granting plaintiffs' motion to dismiss the Second Affirmative Defense as against Bridgeplatforms, to the extent that plaintiffs also receive summary judgment against Bridgeplatforms on infringement.

### E.   *Dismissal of Defendants' Counterclaims*

The Court next will consider the aspect of plaintiffs' motion seeking dismissal of defendants' two Counterclaims.  In their corrected Second Amended Answer, defendants included one Counterclaim for each of plaintiffs' patents. Each Counterclaim contains the same request for relief as against each patent:

"This counterclaim is brought for a Declaratory Judgment that the Plaintiffs' patent and each claim thereof, are not infringed, [and] are invalid, void and unenforceable on grounds set forth in the Affirmative Defenses above."  (Dkt. No. 91 at 7 ¶¶ 8, 15.)  Judge Arcara previously dismissed defendants' attacks on the validity of the patents.  If Judge Arcara takes the additional step of finding infringement as a matter of law against Bridgeplatforms then no triable issues will remain with either Counterclaim, as they pertain to Bridgeplatforms.  The Court thus respectfully recommends dismissal of defendants' Counterclaims as to Bridgeplatforms, to the extent that plaintiffs receive summary judgment against Bridgeplatforms for infringement of their patents.

**F.    _Relationship Between EZ Access, Inc. and Bridgeplatforms, Inc._**

Next, the Court will examine plaintiffs' request that Bridgeplatforms be held liable as a successor corporation to EZ.  As noted above, EZ ceased operations while this case was pending.  Plaintiffs argue that Bridgeplatforms sells the same platform system that EZ did; purchased EZ's assets; and has the same individuals working for it even if those individuals changed ownership and operational roles.  Defendants counter that questions of fact exist regarding what agreements EZ and Bridgeplatforms may have entered regarding transfer of assets and continuation of business; and regarding the roles that the individual defendants may have played in any transition from EZ to Bridgeplatforms.

28

After reviewing the parties' papers, the Court has noticed that the collective nature of plaintiffs' evidence means that successor liability is not yet a live controversy in this case. "An issue is ripe for judicial resolution only if it presents a real, substantial controversy, not a mere hypothetical question. Pursuant to [the] ripeness doctrine, we must avoid entangling ourselves in abstract disagreements and engaging in premature adjudication." *U.S. v. Broadcast Music, Inc.*, 275 F.3d 168, 178 (2d Cir. 2001) (internal quotation marks and citation omitted). Here, plaintiffs have alleged that all of the defendants collectively infringed their patents. Nowhere in the Second Amended Complaint do plaintiffs separate specific defendants for specific acts leading to liability. Additionally, plaintiffs have submitted undisputed evidence, in documentary and testimonial form, that Bridgeplatforms infringed their patents apart from anything that EZ may have done while it operated. Bridgeplatforms thus is liable for patent infringement apart from any liability that any other defendant bears. Under these circumstances, successor liability would be relevant if and only if a jury found EZ liable for infringement, awarded damages specifically against EZ, and declined to award damages against Bridgeplatforms. *Cf. RSR Corp. v. Avanti Dev. Inc.*, No. IP 95–1359–C–M/S, 2000 WL 1448705, at *19 (S.D. Ind. Mar. 31, 2000) ("This motion [for partial summary judgment] is not asking the Court to determine the extent of liability that should be imposed on either [the subsidiary corporation] or

[its parent].  If the evidence at trial supports piercing the veil between [parent] and [subsidiary], the issue of successor liability will become relevant to [the parent]'s liability in the damages phase.").   The Court cannot know in advance whether any trial in this case would produce such an outcome.  The Court thus respectfully recommends denying plaintiffs' motion regarding successor liability, but without prejudice to revisit the issue at trial as Judge Arcara may see fit.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting plaintiffs' motion (Dkt. No. 182) in part as follows: 1) granting the motion to find literal or equivalent infringement of the '240 Patent and '237 Patent by defendant Bridgeplatforms; 2) granting the motion to dismiss defendants' Second Affirmative Defense as to defendant Bridgeplatforms; and 3) granting the motion to dismiss defendants' two Counterclaims as to defendant Bridgeplatforms.  The Court recommends denying plaintiffs' motion to the extent that it seeks any other relief.

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further

judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003)

(citations omitted).

SO ORDERED.

_/s Hugh B. Scott_

HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: June 19, 2012